

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-25-00396-CV

**IN THE INTEREST OF V.A.** and **L.A.**, Children

From the 73rd Judicial District Court, Bexar County, Texas
Trial Court No. 2024PA00434
Honorable Raul Perales, Associate Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice
Dissenting Opinion by: Lori Massey Brissette, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Lori Massey Brissette, Justice
H. Todd McCray, Justice

Delivered and Filed: November 26, 2025

AFFIRMED

This appeal arises from the trial court's order, signed after a bench trial, that terminates the parental rights of appellant J.A. ("Father"), the biological father of V.A. and L.A. (collectively the "Children").[1] In four issues, Father argues that the evidence is legally and factually insufficient to support the trial court's findings on the predicate grounds and best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (O), (b)(2). We affirm.

---

[1] To protect the identities of the minor children in this appeal, we refer to the Children and their family members by initials or pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

# I. BACKGROUND

In March 2024, the Texas Department of Family and Protective Services (the "Department") initiated the underlying proceeding by filing a petition to terminate the parental rights of Father and A.T. ("Mother"), the biological mother of the Children. Thereafter, the trial court signed an "Order for Protection of a Child in an Emergency" that, among other things, appointed the Department as the Children's "temporary sole managing conservator." Father signed a family service plan, and it was adopted and incorporated into a court order. Meanwhile, the Children were placed with paternal great aunt ("Great Aunt") and great uncle ("Great Uncle").

In April 2025, the bench trial commenced. Father was represented by counsel, but he did not personally attend the trial. At the time of trial, V.A. was four years old, and L.A. was three years old. At the trial's conclusion, the trial court found by clear and convincing evidence that: (1) Father allowed the Children to remain in a physically or emotionally dangerous condition or surrounding (subsection (1)(D) endangerment by conditions or surroundings); (2) Father engaged in conduct or knowingly placed the Children with persons who engaged in conduct which endangers the physical or emotional well-being of the Children (subsection (1)(E) endangerment by conduct); (3) Father failed to comply with specific provisions of a court order (subsection (1)(O) failure to comply with court order); and (4) termination of Father's parental rights is in the best interest of the Children (subsection (2) best interest). *See id*. The trial court signed an order that terminated Father's parental rights and appointed the Department as the Children's permanent managing conservator.

Father timely appeals from the termination order.[2]

---

[2] The termination order also terminated the parental rights of Mother. Mother does not appeal, and she is not a party to this appeal.

**II. DISCUSSION**

**A.    Standard of Review**

A parent-child relationship may be terminated, pursuant to section 161.001 of the Texas Family Code, only if the trial court finds by clear and convincing evidence one of the predicate grounds enumerated in subsection (b)(1) and that termination is in a child's best interest.  *See id.* § 161.001(b)(1), (2).  Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id*. § 101.007.

We review the legal and factual sufficiency of the evidence under the standards of review established by the Texas Supreme Court in *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002).  In reviewing the legal sufficiency of the evidence, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."  *Id*. at 266.  "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."  *Id*.  In reviewing the factual sufficiency of the evidence, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing."  *Id*.  "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."  *Id*.

**B.    Law on Endangerment**

Subsection 161.001(b)(1)(D) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-

being of the child[.]" TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Subsection (E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(b)(1)(E). Endangerment means to expose to loss or injury, to jeopardize. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam).

"While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment." *In re N.M.R.*, No. 04-22-00032-CV, 2022 WL 3640223, at *3 (Tex. App.—San Antonio Aug. 24, 2022, pet. denied) (mem. op.). "Subsection D concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment." *Id*. (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). Under subsection (E), the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re J.T.G.*, 121 S.W.3d at 125.

In certain instances, the evidence supporting the trial court's finding of subsection (D) endangerment is intertwined and overlaps with the evidence supporting the trial court's subsection (E) endangerment finding. *Id*. at 131. In such instances, we may consolidate our review of the evidence supporting these findings. *Id*.; *see also In re J.J.V.M.M.*, No. 04-22-00405-CV, 2022 WL 17479144, at *2 (Tex. App.—San Antonio Dec. 7, 2022, no pet.) (mem. op.) (consolidating examination of subsections (D) and (E) findings).

## C.      Endangerment Evidence

At trial, Oscar Aguilar, a family-based caseworker with Child Protective Services, testified as to four areas of concern. First, on or about November 7, 2022, the Department began an investigation because a complaint was made about L.A. crying, two slaps being heard, and L.A. continuing to cry. Aguilar emphasized that Father was the only person in the room with L.A. This incident, according to information that Aguilar received, resulted in L.A. having bruising, swelling, and redness to her eye that necessitated evaluation by emergency medical services ("EMS"). The incident prompted the Department to offer Father individual counseling, random drug testing, and substance abuse treatment.

Second, Aguilar recounted that there were allegations Father had engaged in domestic violence against Mother while the Children were in the home. There were also allegations that Mother had engaged in domestic violence against Father's cousin. The Children's potential exposure to domestic violence was a concern from the outset of the underlying proceeding. In a family service plan signed by Father on April 25, 2024, and admitted into evidence at trial, an area of concern was:

> **Intimate Partner Violence**
>
> Based on *previous criminal history of domestic violence*, there are concerns that [Father] has subjected violence upon an intimate partner. If the domestic violence continues with [L.A.] and [V.A.] in the home, it could negatively impact the mental health and well-being of the children and their future relationships.

(Emphasis added).

Third, Aguilar characterized Father as uncooperative regarding his family service plan, noting that "pretty much through most of the case it was hard to get anything from him . . . ."

Fourth, Aguilar noted that, at some point, the Children began residing with Great Aunt and Great Uncle, with the understanding that Father would be visiting "pretty much every day to take

care of the kids." In March 2024, during the period where the Children were residing with Great Aunt and Great Uncle, L.A. needed medical evaluation for a possible urinary tract infection. However, Mother never coordinated for such care, and Father was incarcerated. This lack of medical treatment presented, according to Aguilar, an immediate danger. It was at this point, in March 2024, that the Department instituted the instant termination proceeding, formally removed the Children, and placed the Children with Great Aunt and Great Uncle.

Ashley Davison, a conservatorship worker, elaborated on Father's periods of incarceration. She testified that Father was incarcerated "at the beginning of the case," from March 2024 through November 2024. Father was not in jail from November 2024 until March 2025. However, in March 2025, the month before trial, Father was incarcerated on a charge of sexual assault, and he was released the week of trial. Father told Davison that the alleged incident occurred when he was drunk, and he, therefore, did not remember it.

Father's incarceration, according to Davison, affected the stability of his housing and employment. Davison noted that while Father had recently obtained employment, he had been unemployed for approximately four months, largely due to periods of incarceration. Moreover, on the day Father was most recently incarcerated, he was in the process of transitioning from a homeless shelter to an apartment.

Great Aunt testified that Father has not accepted he has a problem with alcohol. Moreover, Great Aunt does not believe that Father would put the Children first. Indeed, an area of concern in the family service plan noted that, "[a]t this time, there are concerns that [Father] is consuming excessive amounts of alcohol while being the primary caregiver of [the Children] putting them in imminent danger of injury or death." The family service plan linked intoxication with concerns regarding domestic violence, noting:

Based on previous criminal history and CPS investigations, there are concerns of several altercations between [Mother], [Father] and other family members, while intoxicated or under the influence of illegal substances, with [the Children] . . . in the home, which put [the Children] in imminent danger of serious bodily injury or death.

## D.    Endangerment Analysis

Father argues that the trial court's endangerment findings are legally and factually insufficient because: (1) he tested negative for drugs and alcohol throughout the termination proceeding; (2) the evidence regarding domestic violence was limited to a single incident, and the testimony about the incident was conclusory and unsourced; and (3) incarceration alone cannot support termination.   The Department argues that the totality of the evidence supports the endangerment findings.   It specifically rebuts Father's arguments by highlighting: (1) Father admitted to Davison that he was drunk and could not remember the alleged sexual assault for which he was incarcerated the month before trial; (2) Father's argument ignores the second allegation of domestic violence wherein Father allegedly slapped L.A. with such force that her eye sustained bruising, swelling, and redness that necessitated EMS evaluation; and (3) Father was incarcerated for nine of the thirteen months that the underlying proceeding was pending.

Father references *In re A.D.*, No. 12-17-00334-CV, 2018 WL 6191116, at *4 (Tex. App.—Tyler Nov. 28, 2018, no pet.) (mem. op.), in support of his argument that Aguilar's testimony, without additional facts or elaboration, is legally insufficient.   In *in re A.D.*, the court observed:

There was some evidence that [the father] may have committed domestic violence. Rogers[, a Department caseworker,] testified that there was an "entry" of violence between [the father] and [the mother].   Tassie Ferrell, the Department caseworker, testified that [a child] told her about "violence" between [the mother] and [the father] and drug use.   Ferrell stated that any incident occurred before the children were removed. However, neither caseworker offered additional elaboration or evidence on the "violence" or drug use.

*Id.* The court then held that "the evidence of [the father's] possible 'violence' and drug use, without any additional facts or elaboration, does not constitute an endangering 'course of conduct.'" *Id.*

Father's reliance on *In re A.D.* is misplaced because the trial court in this case may have found that the three instances he tries to isolate are part of a larger pattern. In this case, Great Aunt testified that Father had not accepted he has a problem with alcohol. *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). Davison linked Father's alcohol problem with the sexual assault charge that caused him to be incarcerated the month before trial by testifying that Father told her he could not remember the alleged incident because he was drunk. Regarding imprisonment, the Texas Supreme Court has held:

> Texas cases have . . . held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, but we nevertheless held that incarceration does support an endangerment finding if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child. A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment. Imprisonment thus is certainly a factor the trial court may weigh when considering endangerment.

*In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) (internal citations and quotation marks omitted). The trial court may have found that Father's arrest for sexual assault was an escalation from the alleged slaps to L.A. that prompted the Department's involvement in the first place. Even if the trial court did not make such a connection, Mother was uncooperative and Father was incarcerated when L.A., who was already staying with Great Aunt, needed medical evaluation for a possible urinary tract infection. The trial court may have credited in its endangerment analysis

Aguilar's testimony that Father's unavailability to facilitate L.A.'s medical care posed an imminent danger. *See id*. at 315 ("But such evidence—which in this case includes multiple criminal episodes of escalating seriousness—together with the duration and consequences of the incarceration, is relevant when the resulting abandonment presents a risk, as it did here, to a child's physical or emotional well-being."). Davison also noted that Father's periods of incarceration, including the one a month before trial, undermined his ability to obtain stable employment and housing. *See id*.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we conclude a reasonable factfinder could have formed a firm belief or conviction that Father "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[ren]" and "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Thus, the evidence is legally sufficient to support this finding. Further, after considering the entire record, including any disputed or contrary evidence, we conclude the evidence is factually sufficient to support the trial court's termination under subsections (D) and (E) of the Texas Family Code. Father's first and second issues are overruled.[3]

## E.  Law on Best Interest

It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. In a best

---

[3] In light of our disposition of Father's first and second issues, we need not address Father's third issue. *See In re D.B.S.*, No. 05-20-00959-CV, 2021 WL 1608497, at *7 (Tex. App.—Dallas Apr. 26, 2021, pet. denied) (mem. op.) ("Because the evidence is legally and factually sufficient to support the endangerment findings, we need not address the finding on subsection (O).").

interest analysis, we apply the non-exhaustive *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[4] The set of factors is not exhaustive, and no single factor is necessarily dispositive of the issue. *Id.* at 372; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We recognize there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, promptly and permanently placing a child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). Thus, we also consider the factors set forth in section 263.307(b) of the Family Code. *Id.* § 263.307(b). Additionally, evidence that proves one or more statutory grounds for termination may be probative of a child's best interest, but it does not relieve the Department of its burden to prove best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

In conducting a best interest analysis, we consider direct evidence, circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Additionally, a factfinder may measure a parent's future conduct by his past conduct in determining whether termination of parental rights is in the child's best interest. *Id.* In analyzing the evidence within the *Holley* framework, evidence of each *Holley* factor is not required before a court may find that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27.

---

[4] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

**F.      Best Interest Evidence**

To Father's credit, Davison acknowledged that the Children were bonded to Father. Davison also noted that Father had made strides in completing his service plan. Specifically, Father had completed his psychological evaluation and was two classes shy of graduating from a twelve-week parenting course. Father had submitted to two random drug tests, and the results prompted "no concerns." Father had also been in counseling for two months. The reports that Davison received from the counselor were "positive." When Father was not incarcerated, he participated in weekly visits with the Children that had increased from one to two hours and were set to increase again before his most recent incarceration.

Nevertheless, Davison maintained that Great Aunt and Great Uncle were meeting all the Children's physical and emotional needs. They are providing the Children with a safe and appropriate home, making sure that they are current on all their medical and dental appointments, and attending day care. Davison noted that the Children are bonded with, very responsive to, and take instruction and redirection from Great Aunt and Great Uncle. They call Great Aunt and Great Uncle "mom and dad." The Children look to Great Aunt and Great Uncle for safety and comfort. For example, the Children go to them when they get "boo-boos." Great Aunt and Great Uncle also maintain a sense of "familial culture" with both the paternal and maternal sides of the Children's family. Great Aunt and Great Uncle are "licensed." The Department's permanency goal is for the Children to be adopted by Great Aunt and Great Uncle. Davison was unaware of any impediments to Great Aunt and Great Uncle adopting the Children. Davison believed that Great Aunt and Great Uncle will be able to meet the Children's needs now and in the future.

Great Aunt noted that even though Father is only her nephew, she feels like Father is her oldest son. Great Aunt acknowledged that Father is bonded with the Children. Moreover, she

agreed that it would be in the Children's best interest for them to maintain some relationship with Father, provided that any contact be when he is sober. As already noted, Great Aunt believes that Father has not accepted that he has a problem with alcohol and does not believe that Father would put the Children first.

Great Aunt testified that she had cared for the Children since February 2024. She described the current state of the Children as "wonderful" and that they were "thriving." Before the Children were placed with Great Aunt and Great Uncle, they would visit three or four times a week. Great Aunt has transitioned from spoiling the Children during their visits to parenting. As an example, she makes sure they wake up, eat breakfast, get dressed, and make it to daycare on time. Great Aunt would like to adopt the Children. She noted that she is able to meet the Children's physical and emotional needs and that adoption is in the Children's best interest. There are two other children in Great Aunt's home, and the Children—V.A. and L.A.—are bonded with them.

## G. Best Interest Analysis

"When a child is too young to express her desires, the factfinder may consider whether she has a bond with other caregivers, is well cared for by them, and has spent minimal time with the biological parent." *In re E.M.M.*, No. 04-18-00050-CV, 2018 WL 2323579, at *2 (Tex. App.—San Antonio May 23, 2018, pet. denied) (mem. op.). Both Davison and Great Aunt acknowledged that the Children are bonded with Father. Moreover, Davison noted that Father's weekly visits had increased from one to two hours and were set to increase again. However, the credit that these weekly visits provide in the first *Holley* factor analysis is undercut by the fact that Father was incarcerated for nine of the thirteen months that the Department's termination proceeding was pending. Moreover, the period of Father's incarceration included a stint the month before trial for a charge of sexual assault. On the other hand, Davison testified that the Children were also bonded

with Great Aunt and Great Uncle to the point where they called them "mom and dad." Indeed, Great Aunt testified that the Children are doing wonderful and thriving while in her and Great Uncle's care. She described how the Children had settled into a stable routine in their new home. In light of this evidence, the trial court may have reasonably formed a firm belief or conviction that the first *Holley* factor favored termination. *See id.*

Father's abuse of alcohol is relevant to multiple *Holley* factors, including the Children's emotional and physical needs now and in the future (the second factor), the emotional and physical danger to the Children now and in the future (the third factor), Father's parental abilities (the fourth factor), the stability of Father's home (the seventh factor), and the acts or omissions which may indicate an improper parent-child relationship (the eighth factor). *See Holley*, 544 S.W.2d at 371–72. The family service plan links Father's excessive use of alcohol with "previous criminal history and CPS investigations" relating to altercations with Mother. The trial court may have found that Father's incarceration on a charge of sexual assault was, at least in part, the result of his alcohol use based on Davison's testimony that Father was too drunk to remember the incident. Moreover, Father's periods of incarceration subjected the Children to delays in medical care, as evidenced by Aguilar's testimony regarding L.A.'s potential urinary tract infection. In light of this evidence, the trial court may have reasonably formed a firm belief or conviction that the second, third, fourth, seventh, and eighth *Holley* factors favored termination. *See id.*

After viewing all the evidence in the light most favorable to the best-interest finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights was in Children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. The Children's desires, emotional and physical needs now and in the future, the emotional and physical danger to Children now and in the future, parental abilities, stability of the home, and  acts or

omissions which may indicate an improper parent-child relationship (the first, second, third, fourth, seventh, and eighth *Holley* factors), weigh in favor of termination. *See In re B.G.J.*, 702 S.W.3d 886, 906 (Tex. App.—Eastland 2024, no pet.) (citing *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)) ("Although no single factor is controlling, evidence of a single factor may, in some instances, be sufficient to support the trial court's best-interest finding."). We further conclude that any disputed evidence, viewed in light of the entire record, could have been reconciled in favor of the trial court's best-interest finding or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in Children's best interest. *See In re B.G.J.*, 702 S.W.3d at 906. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Father's fourth issue is overruled.

### III. CONCLUSION

We affirm the trial court's parental termination order.

Rebeca C. Martinez, Chief Justice